IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                                                          CR 00-48 MV

GARY ONIS CLINE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's Objection to the Presentence Report **[Doc. No. 35]**, filed August 15, 2000, and Defendant's Motion to Reconsider Order Denying Defendant's Objection to Ten-Year Penalty Enhancement **[Doc. No. 37]**, filed August 17, 2000. The Court, having considered the motions, responses, relevant law, evidence presented at the hearing and otherwise being fully informed, finds that Defendant's Objection to the Presentence Report is well taken and will be **granted**; and Defendant's Motion to Reconsider Order Denying Defendant's Objection to Ten-Year Penalty Enhancement is not well taken and will be **denied.**

### BACKGROUND

Defendant objects to the Presentence Report, contending that his conviction should not be enhanced based upon a prior conviction because it was obtained in violation of the Constitution. Therefore, the factual background for this matter concerns the validity of the state conviction. Defendant contends that the prior conviction was obtained in violation of the Fourth Amendment, and that Defendant's prior state trial counsel was ineffective in violation of the Sixth Amendment.

1

The initial stop was for a traffic violation. Officer Court of the Merced Police Department testified that he stopped Mr. Cline for failing to come to a complete stop at a stop sign. Mr. Cline disputes this. He testified that there was no stop sign at the top of the ramp on the entrance to Highway 99, and that he came to a complete stop at the previous two stop signs on his route. Besides Mr. Cline's testimony, there is evidence to substantiate Mr. Cline's contention that Officer Court did not stop Mr. Cline on probable cause that he had a committed a traffic violation, but rather to gain information about Mr. Cline's suspected drug trafficking involvement. Officer Court admitted on cross examination that just prior to the stop of Mr. Cline's vehicle, the officers assigned to the street crime unit -- Officers Court, Dash and Johnson -- debriefed about specific individuals they thought were involved in drug trafficking. During the debriefing, Mr. Cline was named as a suspect in marijuana and methamphetamine trafficking. Officer Court admitted knowing Mr. Cline by name before he stopped him. Although Officer Court denies that he ran Mr. Cline's license plate before he stopped him, Mr. Cline testified that when Officer Court first approached him, before Mr. Cline gave him his driver's license, Officer Court called him Gary. There is no dispute that Officer Dash knew Mr. Cline fairly well. Mr. Cline's son, Allen, was an informant for the Merced police, and Officer Dash often went through Mr. Cline to find his son. Officer Dash also admitted that he went to the scene in order to be "nosy" and ask Mr. Cline about drug trafficking.

Officer Court ran a license and warrant check. Mr. Cline's license was valid and he had no outstanding warrants. When Officer Court ran Mr. Cline's name over the radio, Officer Dash, who was patrolling the area, heard Mr. Cline's name. He testified that he radioed Officer Court and asked him to hold Mr. Cline at the scene until he arrived because he wanted to question him

2

about drug trafficking. About five minutes later, while Officer Court was writing Mr. Cline a ticket, Officer Dash arrived. The police report, written by Officer Court, states that shortly after Officer Dash arrived, he asked Officer Court if he could attempt to get Mr. Cline's permission to search the vehicle. The report states, "Officer DASH met with and stated he would like to get consent from CLINE to search the vehicle due to the information he had received from a confidential, reliable informant ... who told him CLINE was dealing large amounts of methamphetamine."

Just after this conversation, a third officer arrived -- Officer Johnson. Johnson and Dash went up to Mr. Cline and asked him to step out of the vehicle. Officer Johnson asked Mr. Cline if there were any drugs in the car. Mr. Cline said no. Officer Dash then asked if he could search Mr. Cline's vehicle. There is some dispute over Mr. Cline's consent to search. Mr. Cline testified that Officer Dash told Mr. Cline that they would dismiss the ticket if he let them search his car. Officer Court testified that he remembered the conversation but was not a part of it. Officer Dash testified that Mr. Cline asked if he consented to a search, would the officers dismiss the ticket. Officer Dash testified that he explained to Mr. Cline that he could not make that kind of deal. Officer Court testified that ten minutes passed between when he initially stopped the car and when they obtained Mr. Cline's consent to search his car. Officer Court also said that he obtained a written consent from Cline to search his car and his person, as well as Mr. Cline's room at the Vassar residence and his room at his parents' house at this time. These written waivers were not produced at the hearing and according to the officers no longer existed.

Officer Johnson searched the vehicle while Officer Court searched Mr. Cline's person. There was a passenger in the car whom Officer Dash spoke to and searched. No drugs or

paraphernalia were found in the vehicle. When Officer Court searched Mr. Cline's person, including his wallet, he found $860 and what he determined were "pay/owe" sheets. He then asked Mr. Cline about the ledger and from where he obtained the money.

Officer Dash searched the passenger, who initially said his name was William Wood. Officer Dash found a piece of paper that had the name William Coe on it. Officer Dash asked the passenger if that was his name and he said yes. Officer Dash then asked Officer Court if the passenger had given a second name. Officer Court replied that he said his name was William Wood. The passenger was arrested for giving false information to a peace officer. The officers testified that Mr. Cline was not under arrest at this time. Nonetheless, they asked him to accompany them to a house on Vassar Street, the address for which was written on a notebook held by the passenger. The officers thought the passenger would be identified by his sister at this house.

Officer Dash testified that he heard that Mr. Cline was dealing methamphetamine and wanted to see if there was evidence in his parents' house. Officer Dash told Mr. Cline that they wanted to search his parents' house, which was the address on Mr. Cline's driver's license. Mr. Cline said that his parents were out of town and he did not want the officers to search their house. Again, there was a dispute about the conversation that ensued. Mr. Cline testified that Officer Dash told him they would tear his parents' house up if he did not consent to search. Officer Dash testified that Mr. Cline simply consented. Both parties testified that Mr. Cline consented only to a search of his room; not the entire house.

During the entire encounter on the side of Highway 99, Officer Court retained Mr. Cline's drivers' license. Just before everyone left the scene, Officer Court testified that they returned

Mr. Cline's documents to him.  The passenger was placed in Officer Court's car, and he and Officer Johnson drove to Vassar Street.  Officer Dash told Mr. Cline to park his car in the 7-11 parking lot, and then Mr. Cline rode with Officer Dash to the house.  Mr. Cline complied.

When they got to the residence, the officers obtained consent to search the house from the woman who lived there.  There is a dispute about whether Mr. Cline lived at this house.  He testified that he did not; the officers testified that the woman said Mr. Cline had a room at the house.  There were other people in the house as well.  The officers asked if there were drugs in the house; the people responded yes.  The officers found 100 grams of marijuana.  Without giving Miranda warnings, they asked Mr. Cline if the drugs were his.  He said they were.  At that point, Mr. Cline was placed under arrest, but no Miranda warnings were given.  In fact, the officers testified that they did not give Miranda warnings until Mr. Cline was in the interrogation room at the police station.

The officers then went to Mr. Cline's parents' house. Although both parties agree that Mr. Cline only gave consent to search his room and not the entire house, the officers searched the entire house.  Officer Johnson searched the garage/barn; Officer Court searched his room; and Officer Dash searched the rest of the house.  The officers found approximately $18,000 in Mr. Cline's room.  They asked him where he got this money.  Mr. Cline said that he earned it.  The officers then asked if it was money from the sale of narcotics.  Mr. Cline replied that some of it was.  The officers also found a scale in the house, and a substance they initially believed to be narcotics but was Vita-blend.  They also discovered Mr. Cline's father's gun in the living room and charged Mr. Cline with being a felon in possession of a gun.

**DISCUSSION**

Mr. Cline contends that the prior conviction was obtained in violation of his constitutional rights. A defendant may attack the applicability of a prior conviction for sentencing enhancement purposes by proving that the conviction was in violation of the Constitution:

> A person claiming that a conviction alleged in the information was obtained in violation of the Constitution of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof by a preponderance of the evidence on any issue of fact raised by the response. Any challenge to a prior conviction, not raised by response to the information before an increased sentence is imposed in reliance thereon, shall be waived unless good cause be shown for failure to make a timely challenge.

21 U.S.C. § 851(c)(2). Defendant claims that his prior state conviction was in violation of his Fourth Amendment rights, as well as his Sixth Amendment right to effective assistance of counsel.

Defendant need only prove one of these constitutional violations. The Government states in its Response that Defendant must prove ineffective assistance of counsel. This is incorrect. The Tenth Circuit rejected such an argument in *United States v. Mixon*, 185 F.3d 875, 888 (10th Cir. 1999) (Unpublished). There, the Government claimed that *Custis v. United States*, 511 U.S. 485, 496 (1994) precluded a collateral attack on a prior conviction on any basis other than the right to counsel. However, the Tenth Circuit evaluated both petitioner's Fourth Amendment claim and ineffective assistance of counsel claim. *Custis* is not applicable to this case. In *Custis*, the Supreme Court was interpreting §924(e) to determine if a defendant could collaterally attack a prior conviction. The Supreme Court distinguished 924(e) from 851(c)(2) in fact, stating that while the latter statute specifically authorized a defendant to collaterally attack a prior conviction,

the former did not. The Court found that the only authority for a defendant to collaterally challenge a prior conviction was the constitutional requirement of effective assistance of counsel laid out in *Johnson v. Zerbst*, 304 U.S. 458 (1938) and *Gideon v. Wainwright,* 372 U.S. 335 (1963). Therefore, the Court held that only with respect to § 924(e), a defendant could only collaterally attack a prior conviction by proving ineffective assistance of counsel. *Custis* at 493-94. *Custis* specifically states that 851(c)(2) allows a defendant to collaterally attack a prior conviction when it has been obtained in violation of the Constitution. Such an attack is not limited to ineffective assistance of counsel. *Id.* at 493.

1.  Fourth Amendment Violation

The testimony is uncontroverted that Officer Court stopped Mr. Cline for a traffic violation. Officer Court then ran Mr. Cline's driver's license, which was valid, and confirmed that Mr. Cline did not have any outstanding warrants. There was no testimony that Mr. Cline engaged in any suspicious behavior that would warrant additional detention. The Court does not decide whether they had probable cause to stop Mr. Cline because the Court finds that the officers' conduct exceeded any permissible scope of the stop.

The stopping of a vehicle for a traffic violation is ordinarily a limited seizure. *See United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988) *overr'd on other grounds*, *United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995) (citing *United States v. Gonzalez*, 763 F.2d 1127, 1130 n. 1 (10th Cir.1985)). A traffic stop must "last no longer than is necessary to effectuate the purpose of the stop" and "be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Therefore, "[a]n officer conducting a routine traffic stop may request

7

a driver's license and vehicle registration, run a computer check and issue a citation." *Guzman*, 864 F.2d at 1519. A driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (citing *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir.1996); *see also United States v. Walker*, 933 F.2d 812, 816 (10th Cir. 1991) (citing *Guzman*, 864 F.2d at 1519) ("Once a driver has produced a valid license and proof that he is entitled to operate the car, 'he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'"); *see also United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (An officer may extend traffic stop beyond initial scope if suspect consents to further questioning or if detaining officer has particularized and objective basis for suspecting person stopped of criminal activity). Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances. *See United States v. Soto,* 988 F.2d 1548, 1544 (10th Cir. 1993) (citing *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *United States v. Ward*, 961 F.2d 1526, 1529 (10th Cir.1992)).

    Once Officer Court determined that Mr. Cline's license was valid and that he had no outstanding warrants, Mr. Cline should have been allowed to proceed on his way. It was impermissible for Officer Dash to ask Officer Court to detain Mr. Cline longer so that he could question him about drug trafficking and obtain a consent to search in order to uncover evidence. In order to question Mr. Cline, Officer Dash must have had reasonable suspicion to believe that there were drugs in Mr. Cline's car. The only evidence that Officer Dash had was that of a tip

8

from a confidential informant that Mr. Cline was involved in drug trafficking. This did not provide reasonable suspicion that Mr. Cline was involved in drug trafficking, let alone that Mr. Cline was carrying drugs in his car at that moment. "A confidential tip may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur." *United States v. Leos-Quijada*, 107 F.3d 786, 792 (10th Cir. 1997) (citing *Alabama v. White*, 496 U.S. 325, 328-30 (1990); *United States v. Elkins*, 70 F.3d 81, 83 (10th Cir.1995). In determining whether the tip is sufficiently reliable to provide reasonable suspicion, a court must consider the credibility or veracity of the informant, the basis of the informant's knowledge, and the extent to which the police are able independently to verify the reliability of the tip. *See White*, 496 U.S. at 328-29, 331-32 (discussing credibility of informant and police verification as factors in assessing reliability of tip); *Adams v. Williams*, 407 U.S. 143, 147-148 (1972) (same); *Illinois v. Gates*, 462 U.S. 213, 230 (1983) (discussing all three factors in assessing reliability of tip in context of probable cause); *Elkins*, 70 F.3d at 83 (discussing police verification in assessing reliability of tip); *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir.1994) (same). Here, no information about the reliability of the informant was introduced. Therefore, the tip did not provide the officers with reasonable suspicion to continue detaining Mr. Cline.

      The Court finds that the stop was extended solely to gain incriminating evidence and information about Mr. Cline's suspected involvement in drug trafficking. Officer Dash testified that he asked Officer Court to detain Mr. Cline until he arrived. However, it is immaterial whether the stop was temporally extended; it is a violation of the Fourth Amendment if the stop

9

exceeded its initial purpose as well. "An officer conducting a routine traffic stop may not ask the detainee questions unrelated to the purpose of the stop, even if the questioning does not extend the normal length of the stop, unless the officer has reasonable suspicion of illegal activity." *United States v. Holt*, 229 F.3d 931, 936 (10th Cir. 2000) (citing *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995)); *see also United States v. Walker*, 933 F.2d 812, 816 (10th Cir. 1991) (stop exceeded scope when officer detained defendant to ask him questions unrelated to speeding infraction or to defendant's right to operate the car); *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995) (although duration of detention was justified, questioning about contraband in car, which was beyond scope of initial stop, was only justified if officer had reasonable suspicion that suspect was transporting drugs).

     A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority. *See Hernandez*, 93 F.3d at 1498. In this case, the officers asked for Mr. Cline's consent to search his person, car, and rooms at the two residences while they still retained possession of his documents. The officers admitted that Mr. Cline's license was not returned to him until the entire roadside stop was completed. About twenty minutes of questioning and searching passed before Mr. Cline's documents were returned to him. This renders the encounter nonconsensual, and the consents given involuntary. *See United States v. Burch*, 153 F.3d 1140, 1143 (10th Cir. 1998) (undue retention of a defendant's documents renders the encounter nonconsensual); *see also Florida v. Royer*, 460 U.S. 491, 501-03 (1983); *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir.1993). As the Tenth Circuit went on in *Burch*, "[i]n a Terry stop or routine traffic stop, an officer's retention of a defendant's documents

is significant because it indicates that the defendant, as a general rule, did not reasonably feel free to terminate the encounter and, therefore, the government cannot rely on the defendant's consent to justify further detention, questioning, or a search." *Id.* (citing *United States v. Lee*, 73 F.3d 1034, 1040 (10th Cir.1996); *United States v. Lambert,* 46 F.3d 1064, 1068 (10th Cir.1995) ("[W]hat began as a consensual encounter quickly became an investigative detention once the agents received Mr. Lambert's driver's license and did not return it to him."); *United States v. Walker*, 933 F.2d 812, 817 (10th Cir.1991) ("[T]he encounter in this case was clearly not consensual.  Officer Graham retained the defendant's driver's license and registration during the entire time he questioned the defendant.").  Therefore, the consent was not voluntary.

    Mr. Cline's consent to search was not given voluntarily for other reasons as well.   When the officers continued questioning Mr. Cline despite the fact that the initial purpose for the stop was concluded, they violated his right to be free from unreasonable seizures under the Fourth Amendment.  His consent to search was tainted by that violation.  Where a consensual search is preceded by a Fourth Amendment violation, "the government must prove both the voluntariness of the consent under the totality of the circumstances and that there was a break in the causal connection between the illegality and the evidence obtained."  *United States v. Ramstad*, 219 F.3d 1263, 1265-66 (citing *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir.1994).  "The Supreme Court has provided three factors that are especially relevant to determining whether a consent is tainted by a preceding illegal search or seizure: 1)  the temporal proximity between the police illegality and the consent to search; 2)  the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct.  *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (citations omitted).

The officers testified that they obtained written consents from Mr. Cline to search his person, his car, and the two residences while at the initial roadside stop. Only ten minutes passed between when the officers stopped Mr. Cline and when they requested consent to search. *See United States v. Fernandez*, 18 F.3d 874, 883 (10th Cir. 1994) (defendant acquiesced to search only moments after illegal detention and questioning by officer); *see also United States v. Ward*, 961 F.2d 1526, 1534 (10th Cir. 1992) (consent not voluntary when "only minutes" passed after illegal seizure); *United States v. Recalde*, 761 F.2d 1448, 1459 (10th Cir. 1985) (no voluntary consent where only "several minutes" lapsed between an illegal detention and signing a consent form). Second, there were no intervening circumstances. Indeed, the temporal proximity in this case is as close as it can be: the request for consent to search and the subsequent conversation about drugs caused the Fourth Amendment violation.

Finally, the purpose and flagrancy of the illegal detention weighs against a finding of voluntariness. Officer Dash was unabashedly candid when he testified that he intentionally asked Officer Court to detain Mr. Cline so that he could investigate Mr. Cline's suspected involvement in drug trafficking. The illegal detention was the means by which to gain an opportunity to question Mr. Cline and to get his consent to search his vehicle and his house. Thus, for the above stated reasons, the Court finds that the consents given by Mr. Cline were not sufficiently purged of the taint of the initial Fourth Amendment violation.

Because the Court finds that Mr. Cline has proved by a preponderance of the evidence that his underlying conviction was obtained in violation of the Fourth Amendment, the Court grants Mr. Cline's objection to the Presentence Report. Accordingly, the Court will not apply the prior conviction for sentencing enhancement purposes pursuant to 21 U.S.C. § 851(c)(2).

*Apprendi* and Mandatory Minimum

Defendant objected to a 10-year penalty enhancement based upon his prior drug-related trafficking offense, stating that *Apprendi* required this factor to be proved as an element of the offense. This Court denied the objection, stating that *Apprendi* did not apply because the factor did not enhance the penalty beyond the statutory maximum. Defense counsel filed a motion for reconsideration, arguing that *Apprendi* applies when a factor increases the mandatory minimum as well, and cited a new Sixth Circuit case for support. The Sixth Circuit has held that *Apprendi* requires that a factor that increases the mandatory minimum is an element of the crime and must be proven to the jury beyond a reasonable doubt. *See United States v. Ramirez*, -- F.3d --, 2001 WL 13939 (6th Cir. (Tenn., Feb. 16, 2001). However, defendant's argument is foreclosed on another ground, and was specifically raised and rejected by the Tenth Circuit. *Apprendi* does not apply to prior convictions.

In *Dorris v. United States,* 236 F.3d 582 (10th Cir. 2000), the defendant challenged his 210 month sentence. Mr. Dorris was convicted on one count of possession of a firearm by a felon under § 922(g)(1). The statutory maximum for this offense is 10 years' imprisonment. 18 U.S.C. § 924(a)(2). Mr. Dorris however, had three prior felony convictions subjecting him to a mandatory minimum sentence of 15 years' imprisonment under 18 U.S.C. § 924(e), the Armed Career Criminal Act. Mr. Dorris argued that the *Apprendi* decision requires the prior convictions be charged, treated as elements of his offense, instructed upon, and proven to a jury. *Id.* at 587. However, the Tenth Circuit held that *Almendarez-Torres* and *Apprendi* specifically precluded prior convictions from the consideration of whether a fact enhances a penalty beyond the statutory

maximum. The Court cited *Apprendi*: "'other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id.* at 587 (citing *Apprendi*, 120 S.Ct. at 2362-63). The Tenth Circuit explained that *Apprendi* stated that this was so because the "use of a prior conviction to increase a defendant's sentence does not implicate the same concerns as other sentencing enhancements because the defendant's previous conviction was accompanied by all the procedural safeguards required in a criminal prosecution." *Id.* at 587-88 (citing *Apprendi*, 120 S.Ct. at 2362).

Therefore, the Court denies Defendant's Motion to Reconsider.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Objection to the Presentence Report is well taken and is hereby **granted**; and that Defendant's Motion to Reconsider is not well taken and is hereby **denied.**

Dated this 12th day of June, 2001.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT COURT

Attorney for United States
Renee Camacho

Attorney for Defendant
Mario Esparza